# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE-OPELOUSAS DIVISION

CONSOLIDATED COMPANIES, INC.                    CIVIL ACTION NO. 98-1804 L-O

VERSUS                                          JUDGE S. MAURICE HICKS, JR

UNION PACIFIC RAILROAD COMPANY,
INDIVIDUALLY AND IN ITS CAPACITY
AS SUCCESSOR IN INTEREST TO
THE SOUTHERN PACIFIC
TRANSPORTATION COMPANY AND
SOUTHERN PACIFIC COMPANY

## MEMORANDUM RULING

This matter came before the Court for bench trial on the sole issue of whether

contiguous parcels of property can be considered as a "facility" for purposes of evaluating the

plaintiff's claims for relief under the Resource Conservation Recovery Act ("RCRA"), 42 U.S.C.

§§ 6901, et seq., and/or the Louisiana Environmental Quality Act ("LEQA"), Louisiana Revised

Statutes 30:2001 et seq.  The plaintiff, Consolidated Companies, Inc. ("Conco"), is the owner

of a parcel of immovable property which was formerly part of a Southern Pacific railroad yard.

The defendant, Union Pacific Railroad Company ("Union Pacific") merged with Southern

Pacific, and for purposes of these proceedings, assumes the obligations and liabilities, if any,

of the Southern Pacific Company and/or Southern Pacific Transportation Company, the former

owner of the Conco property.  Conco contends that the entire former railroad site should be

considered as the "facility" for the purpose of Conco's RCRA and LEQA claims.  Union Pacific

contends that only Conco's property should be considered as the "facility."  For the reasons

which follow, the Court finds that the entire former Southern Pacific site will be considered the "facility" under RCRA and LEQA.

## PROCEDURAL BACKGROUND

This suit was filed in the Western District of Louisiana, Lafayette-Opelousas division in 1998. The case was assigned to Judge Doherty in Lafayette. In May of 2004, the issue of recusal was raised relating to a class action suit filed in the Fifteenth Judicial District Court for the State of Louisiana.[1] That case potentially involves all residents of Lafayette and both Conco and Union Pacific are defendants in the state case. In August 2004, Judge Doherty recused herself and referred the matter of reassignment to Chief Judge Haik. [Doc. No. 82]. After consulting with Chief Judge King of the Fifth Circuit Court of Appeals, Judge Haik issued an order reassigning the case to Judge Hicks. [Doc. No. 83]. Counsel requested and the Court granted a Rule 42(b) trial on the issue of defining the "facility." [Doc. No. 87]. Bench trial was held on October 20, 2004. Evidence on the property boundaries, pollution sources, and contamination levels was admitted. Closing arguments were held on December 2, 2004.

## FINDINGS OF FACT

**I.      Stipulated Findings**[2]

The plaintiff, Consolidated Companies, Inc. ("Conco"), is the owner of a parcel of an immovable property located on the southeast Evangeline Thruway in Lafayette, Louisiana.

---

[1] <u>Johnson, et al v. Georgia Pacific Corporation, et al</u>, Docket No. 2003-5863-K.

[2] These facts are from the stipulations of fact submitted by the parties in the Joint Preliminary Statement. [Doc. No. 89, Sections 2 & 5].

In 1964, Conco purchased the parcel of property from the predecessor in interest of the defendant, the Southern Pacific Company.

There are four essentially contiguous tracts to the north of the plaintiff's property which were also owned and/or operated by The Southern Pacific Company and/or Southern Pacific Transportation Company. As one travels in a northerly direction from the Conco property, the first three contiguous tracts are identified as follows: (1) the Georgia Pacific site located at 814 Southwest Evangeline Thruway; (2) the PMT site located at 810 Southwest Evangeline Thruway; and (3) the P.J.A. Properties, Inc. site currently occupied by Meaders Kitchen Equipment, Thrifty Car Sales and Precision Tune at 600-602 Southwest Evangeline Thruway. The fourth parcel is across Johnston Street at its intersection with the Southwest Evangeline Thruway. There is also an undeveloped parcel known as the Chestnut Street or Johnston Street site. The Georgia-Pacific site was purchased by Georgia-Pacific Corporation from the Southern Pacific Company in 1966. The PMT site and the Johnston Street site are still owned by Union Pacific Railroad. All of the parcels are subjects of litigation against Union Pacific, Georgia-Pacific and Conco pending in the Fifteenth Judicial District Court for the Parish of Lafayette.

At one time, all of these parcels of property were part of the Southern Pacific Transportation Company's railroad yard. Railroad activities at the yard date back at least as far as 1928. Railroad operations at the yard ceased in the mid 1960s. The defendant, Union Pacific, merged with Southern Pacific, and for purposes of these proceedings, assumed the obligations and liabilities, if any, of the Southern Pacific Company and/or Southern Pacific Transportation Company.

There are various constituents attributable to the historical operations of the railroad in the soil and groundwater at each parcel. The Louisiana Department of Environmental Quality ("LDEQ") has issued "No Further Action At This Time" letters for the Georgia-Pacific and Johnston Street sites. However, the parties stipulate that the Conco, PMT, Georgia-Pacific, PJA, Johnston Street sites all have constituents or contaminants located in the soil and groundwater.

Conco has not conducted operations on any of the other parcels that formerly made up the railyard property. Neither Union Pacific nor its predecessors-in-interest conducted railroad operations on the Conco Property after Conco acquired the site in 1964. Solely for the purpose of trial on the scope of the term "facility," Union Pacific stipulates that contamination from pre-1964 railyard operations is present on the Conco Property. The parties only dispute Conco's right to include property not currently owned by Conco. The Court will therefore concentrate on the types and legal ramifications of contamination found on the non-Conco tracts that comprise the remainder of the former Southern Pacific site.

## II. Expert Witnesses

### A. The Site Maps

At trial, counsel and the expert witnesses referred to maps introduced as evidence to assist in the proper depiction of the former Southern Pacific property site and the pollution sources found thereon. Conco presented an aerial photograph of the area which was taken in 1995. Plaintiff also presented the Court with Sanborn Fire Insurance maps copied onto an overlay so that it could be laid over the aerial photograph. The Sanborn maps are dated 1928 and 1940. Union Pacific did not dispute the authenticity of the maps. The defendant noted

only that the overlays were created from the Sanborn maps, but were not the actual Sanborn maps; however, Union Pacific agreed that the overlays appeared accurate.

Additional overlays were copied from LDEQ documents. One overlay map shows borings drilled by Hydro-Environmental Technology Inc., Geraghty and Miller, Inc., ERM Southwest, Inc., and others on the former Southern Pacific site.[3] This is a compilation of data collected between 1991-2000 and is keyed to which firm drilled the borings.[4] Another overlay depicts the regional petroleum phase separated hydrocarbon on the former Georgia Pacific facility and the Conco facility. Another overlay shows the regional groundwater flow map created from information obtained from the borings and monitor wells installed by Hydro-Environmental Technology Inc., Geraghty and Miller, Inc., ERM Southwest, Inc., and others. The final overlay shows concentrations of volatile organic compounds ("VOCs") found in the soil and/or groundwater samples collected during installation of the borings. The map specifically shows areas contaminated with BTEX (an acronym for benzene, toluene, ethyl benzene and xylene), which are identified with a color code.

The overlays were introduced in globo as Plaintiff's Exhibit 1. The Sanborn maps and aerial photographs were introduced in globo as Plaintiff's Exhibit 2. The lab data used to compile the information on the overlays was introduced as Plaintiff's Exhibits 3-11. Below, the Court summarizes the relevant testimony of the expert witnesses including references to these maps.

---

[3]This map was compiled in response to an order issued by Judge Doherty. [Doc. No. 54].

[4]The Parties agreed that there are typographical errors with respect to some of the data, but that the errors "do not matter."

### B.  Stewart Stover

At trial, Stewart Stover, Jr. testified on behalf of Conco.  Stover is a hydrogeologist with over 15 years of experience in remediation.  Stover's firm is Hydroenvironmental Technology ("HET").  HET began monitoring the Conco tract when Conco was first required to perform environmental testing.  The Court accepted Stover as an expert witness in the field of hydrogeology.

Stover began by explaining the aforementioned maps which were introduced as trial exhibits.  He described to the Court the layout of the entire former Southern Pacific site as well as the current property boundaries.  Stover also pointed out buildings, former buildings and potential contamination sources from the former structures and possible conduits that may have been present or may still be present.  Stover identified many potential conduits including a 35,000 gallon barrel tank, machine shops, oil houses, water lines and a wooden drain.  Stover also noted that there was a potential source of contamination on each tract as currently defined.  Stover also noted a 6-inch water pipe that crosses both the Georgia Pacific and the Conco property.  There are also water pipes on the PMT property that cross the Conco property.  Stover admits that the pipes are shown on a historical map but does not know whether these pipes still exist.

In addition, there are  potential conduits of more recent vintage.  Stover testified that there are a storm drain and municipal sewer lines running alongside or underneath the Southeast Evangeline Thruway.  Other evidence of present day conduits has not been found, but Stover points out that no one has yet investigated the area for other possible conduits.

Stover testified that groundwater flow and velocity can be determined from data collected from the groundwater monitoring wells.  Stover also noted that there were no

groundwater monitoring wells on the PJA or Georgia Pacific property indicated on the overlays. The overlays were created from data collected up to August 19, 2003.

Stover further testified about potential conduits for subsurface movement of VOCs (defined by state law as non-hydrocarbon contaminants) on the property. Again, Stover pointed to water lines, the wooden drain and the municipal sewer system that traversed two or more of the tracts. Stover did admit that the sewer line lies to the east of the property and is downgradient from the subject property.

Stover also provided his opinion regarding the groundwater flow from the data collected from various firms. Stover testified that the direction of groundwater flow from Conco and PMT is east/northeast. The groundwater flow from the Georgia Pacific tract is east. There is no data on the groundwater flow from Chestnut Street. Stover opined that it is difficult to determine the actual direction of the subsurface water flow on the former Southern Pacific railroad site because of the lack of a universal monitoring system on the entire former site. Stover testified that there may be bends or other unknown or non-natural conduits that could affect the direction of groundwater flow. He also opined that the Vermillion River could alter the groundwater flow. Construction of the planned Interstate Highway 49 connector was also highlighted as a potential disruption and as a vertical conduit for groundwater flow. Stover testified that migration of constituents from Georgia Pacific to Conco is possible by way of various conduits, notwithstanding the primary direction of groundwater flow.

Stover testified that the groundwater table depth ranges from 8 to 20 feet below land surface. The soil is characterized as silty clay with limited porosity or permeability. However, Stover acknowledged that the contaminants in question have been present in the groundwater for a long time.

Stover specifically opined that the phase plume from the site of the railroad fuel oil tank (now on the Georgia Pacific tract) is tied to the Conco tract by a pipeline that once was connected to a large oil tank situated on the Conco tract. He also noted that there has been no sampling conducted in the vicinity of the water pipe and car shop on the current Georgia Pacific tract.

Although Stover stated that he does not have an opinion as to whether the waterlines are still in existence, he concluded that the pipes are probably still there. Stover does not know if the pipes are older and unpressurized or newer and pressurized. If pressurized, the pipes would not necessarily run with the slope of the land.

Stover also noted that there was only one boring, designated as RB5, on the Georgia Pacific-Conco border. The only monitoring well, MW4 ("Monitor Well 4"), is at the western edge of the Georgia Pacific tract, away from the Conco border.

Stover stated that Conco is currently being required to do further investigative testing by the LDEQ. Stover believes that the state is requiring them to investigate off Conco property to the east. From 1997-2003, HET monitored the Conco tract strictly through monitoring wells. Through these monitoring wells, most heavily in MW3 and MW5, HET has detected the presence of hydrocarbons in the groundwater. MW3 is about 10 feet from the Georgia Pacific property line. Stover further explained that the Conco MW3 is in the middle of the "phase," whereas MW3 on the Georgia Pacific tract is on the border of the "phase." Stover believed that the phase has not been detected by the Georgia Pacific MW3, but VOCs have been. Stover further points out that no sampling has occurred near the 30,000 gallon barrel fuel oil tank site. The new borings on the Conco property are upgradient from the former fuel oil tank and are not likely to show contamination from that tank.

Stover also testified about "RECAP" or Risk Based Corrective Action Program.[5] Stover explained the program as a risk based decision method that LDEQ uses to determine which sites to close. Screening standards are used to determine if contamination is higher than acceptable. Screening standards are divided into industrial and nonindustrial or residential. Industrial standards are lower than residential because LDEQ has determined that the risk to human health is lower on an industrial site than a residential site. Stover also explained that remedial standards are different than screening standards. Remedial standards in an industrial site will be higher than the screening standard.

Stover testified that many of the samples that have been tested are above screening standards, while some of the pollution source areas have not been sampled at all. Stover also notes that RB6 and RB7, located in a residential area, both exceeded the screening standard for residential property, but LDEQ closed the site (*i.e.*, ceased investigation) based on the RECAP industrial standard.

Stover also testified about conditions on the PMT tract. The PMT tract is still under investigation by LDEQ. Most of the constituents are detected in the south central portion of the site. Elemental lead values above the screening standards, both residential and industrial, have been detected. Also groundwater concentrations of constituents above screening standards were detected in PMT09 and PMT13. There are also many samples which detected diesel and motor oil readings above the RECAP standards. Many of these samples were taken in the vicinity of former Southern Pacific structures such as the machine shop and the round house.

-------------------

[5]Throughout his testimony, Stover referred to a document entitled "LDEQ RECAP Screening Standards for Soil and Groundwater" to make comparisons and determine if specific sample levels were above RECAP standards.

Stover then answered questions about sampling on the Chestnut Street tract. HET was first hired to investigate this tract in the early 1990s by the City of Lafayette. HET found hydrocarbons and VOCs (which under the state law definition, excludes hydrocarbons). VOCs were found as deep as eight (8) feet as well as in a groundwater sample. Stover opined that the VOCs are moving along the drain as well as vertically. In 1992, Area 4 had the highest VOCs. Also, EB1 was drilled to 42 feet; the contamination increased with depth. Chestnut Street samples exceeded screening levels as far as 42 feet deep.

Stover further testified that Lafayette Parish obtains its drinking water from the Chicot aquifer system. The City of Lafayette drinking supply aquifer is about 50 feet below the land surface. Stover believes that if sand or aquifer material had been found at a depth of 50 feet, it would be part of the Chicot aquifer system. However, the boring was only drilled to 42 feet below the land surface. This is important because Stover believes that LDEQ would be harder on remedial standards if contamination was in a major potable aquifer system. To Stover's knowledge, there has been no testing of the Chicot aquifer in conjunction with any of these tracts.

The Chesnut tract has received a "no further action" letter from LDEQ. Stover opined that based on the tests and reports made by HET in 1992, it is not only possible for the constituents to move towards Conco, but that is in fact what is happening.

Stover testified that "Bunker C" oil is less volatile and gasoline is more volatile. Stover defined volatility as the ability to break down into a gaseous state. Volatility is one of the first characteristics that is assessed in a RECAP investigation.

Thus far, only hydrocarbons have been found on the Conco tract, but LDEQ is ordering further testing. New borings were drilled in the fall of 2004 closer to the boundary of the

Georgia Pacific property. HET is monitoring the site at Conco's expense. However, as of the date of trial, there was no monitor well or other hard evidence that constituents were actually migrating from the Georgia Pacific tract, or the other tracts, to the Conco property.

Stover stated that he does think that the LDEQ acts in the best interests of citizens and that it would not have issued a "no further action" letter if the site was an imminent and substantial endangerment. However, Stover thinks that LDEQ would not issue such a letter for the Conco tract. In Stover's opinion, the constituents on the former railroad property may present a danger to human health and environment. If the downward vertical migration continues into the Chicot aquifer, Stover testified that it would present a danger to human health and the environment.

### C.    Jimmy Courcier

Jimmy Courcier, a geologist employed by LDEQ, testified on behalf of Conco. Courcier admitted that a no further action or "NFA" letter does not mean that a site is "clean." He also testified that if information "comes to light" that warrants further investigation, LDEQ can reopen an investigation.

Courcier testified that LDEQ has considered these particular property sites separately because of the different time periods that information became available. The overall contamination plume extending over four current tracts of land could have more than one source, but it all stems from the former railroad activities. At this point, Courcier stated that "the Department's hands are tied." For example, Courcier related the sequence of investigation on the Georgia Pacific tract. Part of the Georgia Pacific site was originally opened as a UST site in the early 1990s. A NFA letter was issued. Then a new investigation was opened with Groundwater Division because Bunker C oil was found on another part of

the site. A separate NFA letter was issued. Courcier is not sure if the Georgia Pacific site can be reopened based on testing on the Conco property adjacent to Georgia Pacific.

LDEQ did ask Union Pacific to assess the Johnston Street, PJA (or Meaders Kitchen) and PMT tracts, cut there is no formal compliance order on file at this time. Courcier testified that if the Chicot aquifer was being investigated, the RECAP standards are "utmost strict." He also testified that Conco will not be closed without further assessment, although no formal compliance order has been issued.

### D.    Charles Dartez

Charles Dartez, Vice-President of URS, an environmental assessment group, testified on behalf of the defendant. Dartez has a Bachelor of Science in fisheries biology and has worked in the area of environmental assessment for 22 years. Dartez was accepted by the Court as an expert in the field of hydrology over Conco's objection.

Dartez was hired by Union Pacific to review reports from all of the tracts in question and develop an opinion as to the adequacy of the work already completed in this matter. Dartez opined that the contamination plume on the Conco tract is not the same plume as the one on the Georgia Pacific tract. Dartez referred to the Sanborn maps noting a 35,000 gallon barrel tank on the Conco tract and a different 30,000 gallon barrel tank on the Georgia Pacific tract. Dartez also explained that the pump house, which is not on the Sanborn maps, was located between the two tanks, almost on the present day property line.

Dartez described Bunker C oil as "long-chain hydrocarbons" with very low volatility, very low solubility, and very little volatiles. Dartez admits there is Bunker C impact on the Georgia Pacific tract, as well as an impact from BTEX. BTEX compounds are associated with gasoline and is an acronym for benzene, toluene, ethyl benzene and xylene. Benzene is a

known carcinogen to humans and is volatile in both air and water. Under cross-examination, Dartez admitted that BTEX has been found very near the property line between Conco and Georgia Pacific. There were also BTEX compounds found under the oil tank on the Georgia Pacific tract, even though the tank held Bunker C oil. Dartez explained that there was another area with a gasoline tank on the Georgia Pacific site. Dartez believed that tank was located in the northeast corner of the tract near the Evangline Thruway. Dartez admitted under cross-examination that Bunker C oil may present a threat to human health in the form of hydrogen sulfide if vented to an enclosed structure where people are working.

Dartez, however, does not think that migration from Georgia Pacific to Conco is occurring. Dartez based his opinion on the slow movement and inability to flow through permeable material of Bunker C coupled with the natural gradient flowing away from Conco. It is hard to opine whether either property is affecting the other. However, he noted that there is no evidence on the Conco tract of constituents found on the other tracts. Dartez further noted that the constituents have had decades to migrate. Dartez does not think that the any of the tracts are an imminent and substantial endangerment.

Dartez does not believe that the municipal sewer line on the Evangeline Thruway is contributing to the migration or movement of contaminants onto Conco's property. He admits that it creates the possibility of a conduit, but the fact that the line is downgradient from Conco would make it difficult to act as a conduit onto the Conco property.

Dartez admitted that of the thousands of LDEQ regulated projects he has worked on, he has never encountered an instance where LDEQ ignored property lines and current owners and defined a plume as a facility encompassing more than one property owner. LDEQ defines

sites by plumes within the context of property boundaries. Dartez also explained that RECAP investigations are performed without defining the limits of a contaminated plume.

Dartez explained the RECAP program as a tiered risk approach in defining an area of exposure, interest, investigation or impact (also referred to as "AOI"). Dartez agrees with the approach that LDEQ took in dealing with the former Southern Pacific site by handling the different plumes separately.

Dartez also opined that the risk on the Conco property is less than the risk that was present on the Georgia Pacific tract. Dartez testified that the prior UST site on the Conco property was closed by LDEQ despite the presence of some fuel and hyrdocarbon constituents in the soil.

### E.    Geoffrey Reeder

Geoffrey Reeder, manager of environmental site remediation for Union Pacific, testified on behalf of Union Pacific. The property at issue in this suit lies within his area of responsibility. Reeder's job includes hiring consultants to investigate and conduct remediation. The only cleanup ordered by LDEQ to Union Pacific is on the PMT and Johnston Street sites because they are still owned by Union Pacific.

Reeder does not believe the contamination from PMT is migrating to Conco. He believes that LDEQ would require Union Pacific to address it if evidence showed contamination.

### III.    Findings of Fact

The Court finds that all of the expert witnesses at trial were highly credible and helpful to the Court in understanding the nature of the contamination and remediation. Their

testimony provided a good historical perspective and analyzed substructure conditions and possible spread of contaminants.

The Court finds that the former Southern Pacific railroad site included a 35,000 gallon above ground fuel oil tank, a 30,000 gallon above ground fuel oil tank, a machine shop, a round house, multiple paint houses, multiple oil houses and multiple repair shops. Oil, fuel and dynamite were stored at various locations on the site. In addition, numerous pipelines, wells and drains traversed the property during its active use as a rail yard.

In 1996 a preliminary subsurface investigation was undertaken on the parcel of property owned by Conco in the area of the 35,000 gallon tank. This investigation revealed contamination in the subsurface soil and in the groundwater. These constituents, after laboratory analyses, were determined to be consistent with No. 6 Bunker C fuel oil, a contaminant which is without question linked solely to the operations of the railroad yard. Bunker C fuel oil was stored in the 35,000 gallon storage tank.

Other contamination related to or arising out of the railroad operations of the former site by the defendant, including contaminants, pollutants, hazardous wastes and/or hazardous substances as those terms are defined at law, were discovered throughout the former site at various times by various consultants. Some of these constituents of concern are located on and/or under the property of Conco and some are not. Most of the constituents are linked to the operations of Southern Pacific as admitted by the defendant.

As early as 1990 or 1991, Union Pacific was actually aware of the presence of hazardous wastes and/or hazardous substances at, on, or under the former site and in the groundwater at the various parcels. However, each parcel was treated by LDEQ as a separate "site" according to the property boundaries of the current owners. As a result, when

a parcel of property was evaluated under the Risk Evaluation Corrective Action Program (RECAP) and reported to the LDEQ, it caused the LDEQ to treat the separate parcels "in a vacuum."

At this time, the Court finds that there is not enough evidence to determine whether constituents have migrated or are migrating from the other tracts, especially from the Georgia Pacific tract onto the Conco tract. Testing is ongoing on the Conco site. There is no current testing on the Georgia Pacific site near the Conco border; this area has not been tested before. Based on the evidence to date, the Court cannot conclude that there are in fact subsurface conduits carrying constituents onto the Conco property.

The Court notes that the evidence indicates that LDEQ has followed its policies and procedures in testing all of these parcels. There is no evidence of wrongdoing or ill intentions. However, the restrictive policies of LDEQ make it difficult for the Court to properly assess this situation. Although everyone is in agreement that the identified contamination is a result of the operations of the Southern Pacific railroad, the expanse of the railroad site has not yet been considered as a whole site or single facility. The piecemeal testing of this area makes little sense in the larger scheme.

## LAW AND ANALYSIS

### I.    Introduction

The question before the Court is whether a "facility" as defined by RCRA and LEQA comprises the entirety of the former Southern Pacific property or is restricted to the parcel of property owned by Conco. Also at issue is whether Conco has standing pursuant to Article

III of the Constitution to assert a RCRA claim. Since standing is a threshold jurisdictional requirement, the Court will address that issue first.

## II. Constitutional Standing

Although Union Pacific does not contest Conco's standing in reference to its own property, it does challenge Conco's standing under Article III, Section 2 of the Constitution to expand the definition of "facility" beyond its own property lines. In order to demonstrate standing a plaintiff must show: (1) an injury in fact; (2) a casual connection between the injury and the conduct which is fairly traceable; and (3) a "substantial likelihood that the requested relief will remedy the alleged injury in fact." Interfaith Cmty. Org. v. Honeywell Int'l, Inc., 399 F.3d 248 at 254 (3d Cir. 2005) (quoting McConnell v. FEC, 540 US 93, 225-6, 124 S.Ct. 619, 157 L.Ed. 2d 491 (2003)). Union Pacific contends that Conco cannot show "some realistic threat of injury." Union Pacific argues that Conco cannot show that contaminates are migrating onto its property, therefore there is no realistic threat of contamination or injury from the other properties. The Court will consider each of these factors separately.

### A. Injury in Fact

Conco must show a concrete injury that is "actual or imminent." Interfaith, 399 F.3d 248. As discussed above, Conco alleges claims under RCRA and LEQA. RCRA authorizes suits initiated by "any person . . . . against any person . . . who . . . may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). Conco alleges it has been, is and will be injured by migrating constituents. Conco alleges that it continues to accumulate costs incurred from forced monitoring and remediation efforts. Union Pacific contends that there is no evidence that the constituents are migrating from the

other tracts onto the Conco tract. Conco rebuts that there is sufficient evidence of hazardous constituents found throughout the former Southern Pacific site to establish injury in fact for the purposes of legal standing.

Union Pacific cites Gordon v. Guide Corporation, 2001 WL 1168144 (S.D. Ind. 2001). In Gordon, the court found that the plaintiff did not have standing because there was an "absence of any evidence of a path between the chromium spill on defendants' property and plaintiff Gordon's water supply or any location he uses for recreational purposes." The evidence showed that there was no detectable levels of chromium in the ground water close to the site of the spill and that the plaintiff's property was upgradient from the spill area.

The Court finds Gordon distinguishable from the current matter. Whereas the plaintiff in Gordon had an absolute dirth of evidence supporting his claim, Conco has provided the Court evidence of contamination on the Conco tract as well as the other tracts constituting the former Southern Pacific site.

At trial, evidence was admitted that the Conco property is upgradient from any known pollution sources. However, Conco also elicited testimony that the patterns may change, especially if construction begins on the planned I-49 connector adjacent to the properties in question. The samples taken show levels of contaminants in excess of RECAP screening standards throughout the former Union Pacific site. Furthermore, Conco provided evidence that the City of Lafayette's water supply is the Chicot aquifer which lies beneath the land surface at issue.

Conco further alleges injury as a result of the piecemeal investigations by the Louisiana Department of Environmental Quality ("LDEQ"). Conco alleges that Union Pacific has provided selective information in a piecemeal fashion to LDEQ, thus preventing LDEQ

from properly assessing the property and protecting the citizens from contamination of the city's aquifer. [First Supplemental and Amended Complaint, ¶¶ 7-8].

Conco need only show threatened harm, not actual injury, in order to survive a standing challenge. "'Injury in fact' reflects the statutory requirement that a person be 'adversely affected' or 'aggrieved,' and it serves to distinguish a person with a direct stake in the outcome of a litigation -- even though small -- from a person with a mere interest in the problem. We have allowed important interests to be vindicated by plaintiffs with no more at stake in the outcome of an action than a fraction of a vote." United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 690, 93 S. Ct. 2405, 2417, 37 L. Ed. 2d 254 (1973).

In this case, Conco has shown that: (1) pollution sources exist throughout the former Southern Pacific site; (2) contamination levels on the other tracts exceed RECAP screening standards; and (3) contamination on Conco's property exceeds RECAP screening standards. Conco is currently under LDEQ orders to monitor the area bordering the Georgia Pacific tract. Conco has incurred and continues to incur costs to perform the required monitoring and remediation. If there are contaminants migrating onto the Conco property, Conco will be forced to expend its own funds to continue monitoring and conduct remediation.

The Court finds that Conco has met the low threshold of showing actual or threatened harm. The Court will now determine traceability.

### B.    Fairly Traceable

Conco also must show that the injury in fact is traceable to the other properties. The "fairly traceable" requirement "is not equivalent to a requirement of tort causation." St. Bernard Citizens for Envtl. Quality, Inc. v. Chalmette Ref., L.L.C., 354 F. Supp. 2d 697, 704 (E.D. La.

2005); quoting Pub. Interest Res. Group, Inc. v. Powell Duffryn Terminals, Inc., 913 F.2d 64, 72 (3d Cir. 1990), cert. denied, 498 U.S. 1109, 112 L. Ed. 2d 1100, 111 S. Ct. 1018 (1991). Plaintiffs need only show that there is a "substantial likelihood" that the defendant's conduct caused plaintiffs' injury. See Duke Power Co. v. Carolina Envtl. Study Group, Inc., 438 U.S. 59, 79, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978). The Fifth Circuit has held that plaintiffs may satisfy this requirement by presenting only circumstantial evidence that their injuries are connected to alleged violations. St. Bernard Citizens for Envtl. Quality, Inc. v. Chalmette Ref., L.L.C., 354 F. Supp. 2d 697, 703 (E.D. La. 2005)(citing Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp., 207 F.3d 789, 792-793 (5th Cir.2000).

Conco has produced evidence of USTs on the contiguous properties that make up the former Southern Pacific site. The expert testimony admitted that it is possible, even if not presently occurring, for USTs to move onto the Conco property. The Court finds that this is sufficient to meet the low threshold requirement of traceability in the analysis of constitutional standing.

### C.    Redressability

Plaintiffs must also demonstrate that the relief they seek will redress their injuries. Laidlaw, 528 U.S. at 185. An injunctive remedy is an appropriate form of redress if it will effectively abate or deter illegal conduct that is ongoing at the time of suit. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 108, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998); Powell Duffryn, 913 F.2d at 73; Texans United v. Crown Central Petroleum Corp., 207 F.3d 789, 793-94 (5th Cir. 2000); St. Bernard Citizens for Envtl. Quality, Inc. v. Chalmette Ref., L.L.C., 354 F. Supp. 2d 697, 705 (E.D. La. 2005).

In this matter Conco has asked for issuance of an injunction and recovery of remediation costs. The Court finds that Conco has shown sufficient evidence to demonstrate that injunctive relief and civil penalties would redress Conco's complained injuries.

### D.    *Conclusion of Constitutional Standing*

For the foregoing reasons, the Court finds that Conco has standing under Article III, Section 2 of the Constitution to assert a RCRA claim concerning property beyond its own property lines. The Court will now consider whether the "facility" (as defined by RCRA and LEQA) comprises the entirety of the former Southern Pacific property, or is instead limited by property lines.

## III.    Resource Conservation Recovery Act

### A.    *Citizens Suit Provision*

Conco pleads a claim pursuant to 42 U.S.C. § 6972(a)(1)(B), commonly referred to as the Citizens Suit Provisions of RCRA. The statute states that "any person may commence a civil action on his own behalf." Id. The plaintiff in effect acts as a private attorney general for the citizens. Prisco v. A & D Carting Corp., 168 F.3d 593 (2d Cir. 1999). In order to prevail, the plaintiff must establish the following elements:

1.    The defendant is a person, including, but not limited to, one who was or is a generator of solid or hazardous waste, or one who was or is an owner or operator of a solid or hazardous waste treatment, storage or disposal **facility**;

2.    The defendant has contributed to, or is contributing to, the handling, storage, treatment, transportation, or disposal of solid or hazardous waste; and

3.    The solid or hazardous waste may present an imminent and substantial endangerment to human health or the environment.

42 U.S.C. § 6972(a)(1)(B)(emphasis added); <u>Cox v. City of Dallas</u>, 256 F.3d 281, 292 (5th Cir. 2001); <u>see also</u> <u>Interfaith Cmty. Org. v. Honeywell Int'l, Inc.</u>, 399 F.3d 248 (3d Cir. 2005), <u>cert denied</u>, __ US __, 125 S.Ct. 2951, 162 L.Ed.2d 869 (2005).  Prevailing parties are entitled to injunctive relief against the defendant for removal of all solid and/or hazardous wastes from the facility in order to restore the facility to non-hazardous condition.  In addition, prevailing parties can recover all costs, including attorney and expert witness fees.  42 U.S.C. § 6972(a); 42 U.S.C. § 6972(e); <u>Meghrig v. KFC Western, Inc.</u>, 516 U.S. 479, 484, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996); <u>Cox v. City of Dallas</u>, 256 F.3d 281, at 288; <u>Tanglewood East Homeowners v. Charles-Thomas, Inc.</u>, 849 F.2d 1568, 1575-1576 (5th Cir. 1988).

Union Pacific does not contest that it is a generator under RCRA or that the past railroad operations led to solid or hazardous waste on the property.  Therefore, the only dispute remaining for trial is whether Conco can show an "imminent and substantial endangerment to health or the environment."  Conco contends that it can introduce evidence of contamination from the entire former Southern Pacific site in proving "imminent and substantial endangerment."  Conco also alleges "imminent and substantial endangerment to health" of all residents of Lafayette because of the threat to the Chicot aquifer.  However, Union Pacific contends that Conco is limited to evidence of alleged contamination within its own property boundaries.

The issue of whether the land is an "imminent and substantial endangerment to health or the environment" is an issue on the merits which is not currently before the Court.  To the contrary, the Court need only decide whether Conco can allege an "imminent and substantial endangerment to health or the environment" with regard to the entire former Southern Pacific

site, or whether it is limited to its own property boundaries. This determination is dependent upon the proper construction of the term "facility" under RCRA.

Although the term "facility" is referred to throughout RCRA, there is no general definition. The only definition of "facility" is found in the sub-title dealing with underground storage tanks:

> For purposes of this paragraph, the term "facility" means, with respect to any owner or operator, all underground storage tanks used for the storage of petroleum which are owned or operated by such owner or operator and located on a single parcel of property *(or on any contiguous or adjacent property)*.

42 U.S.C. § 6991(b)(6)(D)(emphasis added). Conco contends that this definition should be used to define "facility" in the citizens suit provision.

RCRA also has an integration provision, 42 U.S.C. § 6905, which provides that the Administrator of the Environmental Protection Agency

> . . . shall integrate all provisions of [RCRA] for purposes of administration and enforcement and shall avoid duplication, to the maximum extent practicable, with the appropriate provisions of . . . such other Acts of Congress that grant regulatory authority to the Administrator. Such integration shall be effected only to the extent that it can be done in a manner consistent with the goals and policies expressed in this chapter and in the other acts referred to in this subsection.

Conco contends that this integration provision requires RCRA to be read *in pari materia* with the definition of "facility" in the Comprehensive Environmental Response, Compensation, Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq., provisions defining "facility." CERCLA defines "facility" as:

> A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) *any site or area where a hazardous substance has been*

*deposited, stored, disposed of, or placed, or otherwise come to be located*; but does not include any consumer product in consumer use or any vessel.

42 U.S.C. § 9601(9)(emphasis added).  Conco contends that the integration provision, when read with 6991(b)(6)(D) and CERCLA, provides the basis for construing "facility" under RCRA to include contiguous or adjacent property.  "Facility" would therefore include the entirety of the former railroad yard.

Courts have read CERCLA definitions *in pari materia* with RCRA.  Tanglewood East Homeowners, 849 F.2d at 1574.  The Tanglewood court read the definition of facility under CERCLA as leaving "no room for doubt" that an entire development, as opposed to the individual parcels of property owned by the private citizens, constituted a facility.  Id. at 1573. Although the court does not specifically state such, it appears that the court used the same parcel as defined under CERCLA for the RCRA claims.  Id.

Conco contends that the entirety of the former railroad yard is a "facility" under RCRA because hazardous substances have "come to be located" throughout the contiguous properties from Conco to Chestnut Street.  Union Pacific attempts to distinguish Tanglewood because the plaintiffs were all landowners and members of the homeowners association of the subdivision which was contaminated.  However, neither RCRA nor CERCLA distinguish residential from commercial or industrial "facilities."

One of the purposes of the citizens suit provision is to provide a mechanism for federal relief when a state regulatory scheme fails to provide the proper relief.  Conco alleges that Union Pacific has provided piecemeal information to LDEQ which, because it was not considered in conjunction with the entirety of the former railroad site, did not allow the regulatory agency to fairly and adequately protect the citizens of Lafayette from the imminent

and substantial endangerment to human health and the environment which exists at the facility. This is particularly so because there is a continuing presence of hazardous substances, hazardous wastes, contaminants and pollutants in the groundwater and subsurface of the former railroad site. Importantly, the Chicot Aquifer (which provides drinking water for the city of Lafayette) also lies beneath the old railroad yard property.

Conco has filed suit against Union Pacific as a result of pollution throughout the former railroad site. The Court finds that it is consistent with both RCRA and CERCLA to include the entire site in the definition of "facility." Conco has shown that LDEQ considers this site as separate facilities, not only defined by property lines, but even smaller sections. Conco has also shown that LDEQ is at this time unwilling to reopen an investigation on the Georgia Pacific site. The Court finds that the regulatory scheme set by the state does not properly address this situation. This is particularly important because of the health concerns regarding the freshwater Chicot aquifer. Therefore, for the purposes of the RCRA claim, the Court finds that the entire former Southern Pacific railroad yard should constitute the "facility" in this case.

## IV.   LOUISIANA ENVIRONMENTAL QUALITY ACT ("LEQA")

Conco also seeks to define the "facility" as the entire former railroad site in conjunction with its claims under LEQA. Again, Union Pacific urges that the relevant "facility" should be limited to Conco's own property.[6] For the reasons which follow, the Court finds that the entire former railroad yard can and should be considered for purposes of Conco's claims under LEQA.

---

[6]Since this is the sole issue before the Court, the Court will not address the timeliness of Conco's LEQA claims or the applicability of the hydrocarbon exception.

LEQA's Citizen Suits provision provides that "*any person* having an interest, which is or may be adversely affected, may commence a civil action on his own behalf against any person whom he alleges to be in violation of this Subtitle II or of the regulations promulgated hereunder." La. R.S. 30:2026(A)(1)(emphasis added). However, Union Pacific contends that Conco can have no Section 2026 suit beyond its own property lines since it does not have "an interest" in any land beyond that.

According to Section 2004(14), for purposes of the subtitle containing the Citizen Suits provision,

> "Facility" means a *pollution source* or any public or private property or facility where an activity is conducted which is required to be regulated under this Subtitle and which does or has the potential to do any of the following:
> (a) Emit air contaminants into the atmosphere.
> (b) Discharge pollutants into waters of the state.
> (c) Use or control radioactive materials and waste.
> (d) Transport, process, or dispose of solid wastes.
> (e) Generate, transport, treat, store, or dispose of hazardous wastes.

In turn, Section 2004(13) defines "pollution source" as:

> the immediate site or location of a discharge or potential discharge, including such surrounding property necessary to secure or quarantine the area from access by the general public.

Accordingly, it appears that the "facility" is defined as the *location of a discharge* without regard to property lines. Likewise, in the context of an LEQA remedial action, Section 2204(C) provides that a "hazardous waste site" includes "*the entire contaminated area* and may extend beyond a facility's boundary." (Emphasis added). Accordingly, the Court finds that for

purposes of Conco's LEQA claims, the "facility" is the entire former Southern Pacific railroad yard.[7]

## CONCLUSION

For the foregoing reasons, the Court finds that the contiguous parcels of property which represent the former Southern Pacific railroad yard constitute the "facility" for purposes of evaluating the plaintiff's claims for relief under the Resource Conservation Recovery Act ("RCRA"), 42 U.S.C. §§ 6901, et seq., and/or the Louisiana Environmental Quality Act ("LEQA"), Louisiana Revised Statutes 30:2001 et seq.

Therefore:

**IT IS ORDERED** that the contiguous parcels of property which represent the former Southern Pacific railroad yard constitute the "facility" for purposes of evaluating the plaintiff's claims for relief under the Resource Conservation Recovery Act and/or the Louisiana Environmental Quality Act.

**IT IS FURTHER ORDERED** that this matter be referred to the Magistrate Judge for entry of a new scheduling order and associated discovery plan so that the matter may proceed for adjudication on the merits.

**DONE AND SIGNED** in Shreveport, Louisiana, this 17th day of February, 2006.

_____
S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE

---

[7]The Court's ruling does not mean to suggest Conco can recover for any remediation costs beyond its own property.